[Cite as *State v. Hayden*, 2019-Ohio-1926.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 18CA3839 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| CARL HAYDEN, | : | |
| | : | |
| Defendant-Appellant. | : | **Released: 05/17/19** |

_____
APPEARANCES:

Stephen T. Wolfe, Wolfe Law Group LLC, Columbus, Ohio, for Appellant.

Shane A. Tieman, Scioto County Prosecutor, and Jay Willis, Assistant Scioto County Prosecutor, Portsmouth, Ohio, for Appellee.
_____

McFarland, J.

{¶1} This is a delayed appeal from a Scioto County Court of Common Pleas judgment entry convicting Appellant, Carl Hayden, of aggravated murder with a firearm specification, murder with a firearm specification, four counts of felonious assault all with firearm specifications, improperly discharging a firearm into a habitation or a school safety zone, and one count of menacing by stalking. After merging the count for murder and several of the assault counts, the court sentenced Appellant to life without parole plus twenty two years. On delayed appeal, Appellant

contends that 1) the trial court erred when it permitted the introduction of testimony that was impermissible as both hearsay and in violation of Appellant's right to confront witnesses against him, 2) the jury's verdict was against the manifest weight of the evidence, and 3) the evidence presented at trial was insufficient to support the convictions.

{¶2} Although we find that the trial court abused its discretion in admitting hearsay testimony, we hold that the error was harmless because there was still overwhelming evidence supporting Appellant's convictions. Our holding renders the second argument in Appellant's first assignment of error, as well as his second and third assignments of error, moot. Accordingly, the judgment of the trial court is affirmed.

Introduction

{¶3} Appellant, aka "Whitey," and Amber Piquet lived together and had a daughter, Sadie. However, in October of 2016 Ms. Piquet moved out and lived with her two children, Sadie and Dallas, in a trailer owned by Eric and Tonda Martin near the intersection of Martin and Piguet roads in Scioto County. Appellant and Ms. Piquet had a lawsuit pending to determine custody and visitation of Sadie.

<u>911 Calls</u>

{¶4} On the evening of January 9, 2017, the Scioto County Sheriff's Office received multiple 911 calls regarding a shooting at a trailer near the intersection of Martin and Piguet roads. The first call was from Kayla Rozell and was received at 7:04 p.m. Kayla Rozell, Ms. Piquet's neighbor, said she saw a man trying to force his way into Ms. Piquet's trailer, and then she heard gun shots. She never identified the man by name, but after describing the van in which the man escaped in as being red, she said "I had seen that guy - -." Near the end of the call the operator said "And you don't know the guy's name either" and Kayla Rozell responded: "I don't – I don't know for sure if it was him or not, but I know that she had problems with a guy * * *."

{¶5} A second 911 call was received from Gretchen, Ms. Piquet's seven-year-old niece who was in the trailer at the time of the shooting. Gretchen told the operator that "[s]omebody just shot in – in the window and they killed * * * my aunt." Gretchen told the operator that "there's blood all over the carpet."

{¶6} Finally, the Sheriff's Office received a third 911 call from Tonda Martin about the shooting. Mrs. Martin requested an ambulance be sent because Amber Piquet had been shot.

## The Murder Scene

{¶7} Several deputies were initially dispatched to the scene. When the deputies arrived, they were advised by the operator that the suspect had fled in a red van. The deputies noticed that the door on the trailer had been forced. They entered the trailer and made contact with Eric Martin. He told the deputies that the victim, Amber Piquet, was in the bedroom. In the bedroom, the deputies found Ms. Piquet lying on the ground with Tonda Martin beside her. Deputy Lewis determined that Ms. Piquet had been shot and that she was dead. There were several bullet holes in the trailer that appeared to have been shot through a window from the outside because the blinds were pushed inward.

{¶8} Later that night, Appellant turned himself in and the deputies questioned him about the murder.

## The Charges

{¶9} The State charged Appellant with aggravated murder with a firearm specification, murder with a firearm specification, four counts of felonious assault all with firearm specifications, improperly discharging a firearm into a habitation or a school safety zone, and one count of menacing by stalking.

{¶10} At trial, the State presented twenty-five witnesses and evidence, including sheriff deputies, detectives, neighbors, Ohio Bureau of Criminal Identification and Investigation (BCI) specialists, the Hamilton County Assistant Coroner, a Glock handgun and DNA evidence. The defense presented five witnesses. Much of the testimony and evidence is set forth below. Detective Jodi Conkel was the lead detective in the case. She worked with several detectives and BCI employees in the case.

### The State's Case

### a. Lay Witnesses

{¶11} Kayla Rozell testified that she lived across the street from the trailer where Amber Piquet was shot. She testified that she worked at home and would often see a man in a silver pickup truck try to get into Ms. Piquet's trailer, or chase Ms. Piquet across her front yard. She testified that the man had placed a deer camera outside of Ms. Piquet's trailer.

{¶12} Kayla Rozell testified that on the evening of January 9, 2017, she "saw headlights and saw a vehicle there and a moment or two later I heard very loud banging noises and that's when I went up closer to the window and I saw him with a - - long object, like maybe an ax or a baseball bat. I couldn't tell exactly what. Just banging on the door like - - like he was trying to bust it down." She further testified that she stepped away from

the window for a moment, because with all her lights on, she was afraid that he would see her, but two or three seconds later she heard gunshots and looked out the window and saw the man run away from the trailer to a "burgundyish, reddish" van. As the man got in the van, it was illuminated from the headlights of a neighbor's car. As the van fled at a high rate of speed, she called 911. Kayla Rozell testified that she did not know Appellant by name before the night of the murder, but had seen him at Amber Piquet's home many times before.

{¶13} Kayla Rozell testified that on the evening of the murder, Detective Malone showed her a photo array of six men and asked if she recognized any of them as the man outside Amber Piquet's trailer. She picked Appellant's photo. Ms. Rozell also identified Appellant in open court as the man who was beating on the door of Amber Piquet's trailer on January 9, 2017.

{¶14} Ms. Rozell testified that she could see well even though it was dark because of the numerous lights on her property (LED porch lights, a pole light and a light at the top of her garage), Amber Piquet's porch lights and her bedroom light were on, and when a neighbor pulled into their driveway the vehicle's headlights lit up the van.

{¶15} On cross examination, defense counsel pointed out that during the 911 call Ms. Rozell stated: "And I am not for sure if it's him or not." However, Ms. Rozell responded: "Well I did know for sure it was him. As you can tell I was flustered * * *." Later during cross examination, after defense counsel questioned whether Appellant's name had been "suggested" to her, she responded "It was not suggested to me. I knew his face. I just didn't know his name."

{¶16} The defense attorney also asked Ms. Rozell if she noticed that one of the headlights was out on the van. She said she did not notice that damage.

{¶17} Eric Martin testified that he was married to Tonda Martin and they were Amber Piquet's landlords. Ms. Piquet's trailer was at the end of the Martins' driveway. Eric Martin testified that he and his wife were friends with Amber Piquet and her children, Dallas and Sadie.

{¶18} Eric Martin testified that he had known Appellant, as Whitey, since the 1980s. He testified that Appellant drove through the neighborhood often in a silver pickup with a loud muffler and often stopped by to harass Ms. Piquet. Mr. Martin testified that Appellant admitted he placed a camera outside Amber Piquet's trailer. Mr. Martin said that Appellant was telling all the neighbors that he was renting to a pedophile.

{¶19} Eric Martin testified that on January 9, 2017, Tonda Martin took Ms. Piquet to a court custody hearing and then Tonda Martin went to work, while Sadie stayed at home with him. He testified that he and his wife were sitting down to dinner in their house that night at about 7:00 p.m. when Mrs. Martin received a call indicating that it was from Amber Piquet, but when she answered, the call dropped. Eric Martin testified the phone rang again and Mrs. Martin answered it and screamed "Oh my God Amber's dying." Eric Martin stated that he and his wife jumped in their vehicle and drove to Ms. Piquet's trailer, and that it took about a minute and a half to get to there. Mr. Martin testified that the trailer door was dented and the door handle had been broken off, but the door was still locked. He kicked the door down. He testified that the kids (Gretchen, Dallas, and Sadie) were screaming and yelling; they were horrified.

{¶20} The prosecutor asked Eric Martin if the children said anything. Defense counsel objected. At a side bar discussion, the prosecutor argued the statements were admissible as a present sense impression or an excited utterance. Defense counsel argued that they were too remote in time. After the court overruled defense counsel's objection, Mr. Martin testified that Gretchen said "Whitey killed sis" and that Dallas said "Whitey killed mom."

{¶21} Eric Martin went to get his sister-in-law, Christy Martin, who lived nearby and was a nurse practitioner. He returned to the trailer with Christy Martin, who determined that Amber Piquet had no pulse.

{¶22} On cross examination by defense counsel, Mr. Martin admitted that he did not like Appellant.

{¶23} On re-direct examination, Eric Martin testified that there was no bad blood between he and Appellant until after Appellant met Ms. Piquet.

{¶24} Tonda Martin testified that she did not know Appellant until after Amber Piquet moved into the trailer. Mrs. Martin recalled that Appellant would often stop by and talk about a sexual predator who was in the area, although she admitted that he spoke to her husband more about that issue that he did with her. However, Mrs. Martin did testify that she was concerned with Appellant "circling" the house to the extent that if Ms. Piquet heard Appellant's truck "Eric would drive down and/or we would tell her to just come up to the house, because we did not want her to be afraid * * *."

{¶25} Mrs. Martin went on to testify regarding the events of January 9, 2017, which in large part corroborated with Eric Martin's testimony, subject to the following exceptions. She testified that after the phone call from Ms. Piquet dropped, she called back and Gretchen answered (Eric

Martin testified that Gretchen called Tonda Martin), and said "sis is dying."

Mrs. Martin recalled that after the phone call they made it to the trailer in

five minutes at the most (Eric Martin said one minute thirty seconds).

{¶26} Except for Sadie saying that she was scared, Tonda Martin

testified she did not recall anything that the children said. She testified that

she took the children out of the trailer and put them in their car and called

911.

{¶27} On cross examination, Mrs. Martin testified that when she

called 911 and said "I just know that [Appellant] did it," she admitted that

she never saw Appellant that night, it was just her opinion that Appellant

killed Amber Piquet.

{¶28} Christy Martin, Eric Martin's sister-in-law, testified that after

she had determined that Ms. Piquet had no pulse, she noticed the children

were alone in the car and they appeared to be upset. Ms. Martin didn't think

they should be alone, so she got into the car and asked them what happened.

After the court overruled Appellant's objection, she said that Gretchen

responded " 'Whitey shot her' and she told me about the door and Amber - -

he was wanting in and Amber said, 'You can't come in. You better leave

Carl.' "

{¶29} On cross examination, Christy Martin testified that she spoke to the children about 15 minutes after she arrived at the scene.

{¶30} Amanda Twaddle testified that she knew Appellant as Whitey. She testified that on January 9, 2017, Appellant was waiting in his driveway in his maroon van until she drove by so he could pull out of his driveway. She testified that he turned left heading toward South Webster at approximately 6:45 p.m.

{¶31} On cross examination, Ms. Twaddle testified that her sister had sold an identical looking van to Jerry Hammonds, Appellant's neighbor. She also testified that she did not notice a missing headlight on Appellant's van that night.

{¶32} Lisa Roof testified she lived at 212 Martin Road. She was not familiar with either Amber Piquet or Appellant. She testified that on January 9, 2017, she was on her way home at about 7:00 p.m. driving through the intersection of Piguet Road and Martin Road when she noticed a "reddish maroon" van parked alongside the road. She testified that after she pulled up her driveway, the van sped off.

{¶33} Gene Smith, one of Appellant's neighbors, testified that he also knew Appellant by the nickname "Whitey." He also testified that Appellant usually carried a Glock 27 in a waistband holster, but he wasn't carrying a

gun that night. Mr. Smith testified that Amber Piquet and Appellant had lived together, but after Ms. Piquet moved out, Appellant told Gene Smith that "he had thought about killing Amber, Amber's mom and brother, the whole family." Mr. Smith also said that Appellant commented that "he needed a quieter vehicle so he could sneak up on them." Mr. Smith testified that Appellant had a gray Dodge truck with a diesel, but later acquired a red minivan.

{¶34} He further testified that the date of the murder, he saw Appellant pull into his driveway in his van when it was almost dark. Mr. Smith testified that he parked the van in the field by his house and shortly after he got in his truck and left.

{¶35} On cross examination, Mr. Smith testified that he thought that Appellant was merely blowing off steam when he made the comment about killing Amber and her family.

{¶36} John Bair, also a neighbor of Appellant, testified that he was aware that Appellant was in a custody dispute with Ms. Piquet. He testified that his conversation with Appellant about Ms. Piquet led him to believe that Appellant was "obsessive" about her, and he became more obsessive prior to the date of her death.

**{¶37}** Mr. Bair also testified that Appellant owned and truck and a red minivan. He stated that on the day of the murder, Appellant pulled into his driveway in his truck at "roughly dark." At the time that "dark actually fell," he saw a vehicle leave Appellant's house. He assumed it was the van since he did not hear the sound that the truck made. Later, at 8:00 p.m., he saw headlights of a vehicle pulling into Appellant's driveway that parked in the field by Appellant's house.

**{¶38}** Mr. Bair testified that Appellant came over to his house twice that night. He testified the first time Appellant acted "concerned" and was asking about a shooting. Mr. Bair testified that Appellant asked him if he would be a witness that Appellant was home all day even though he had not been home all day. After Appellant left, he returned about ten minutes later. He testified that Appellant was "very nervous" and said Appellant stated that he found out Ms. Piquet was the one who was killed.

b. Witnesses re: The Firearm

**{¶39}** Timothy Lewis testified that approximately 15 years ago he owned a Glock handgun that he sold to Appellant. The Glock gun box recovered from Appellant's home was traced as originally being owned by Timothy Lewis. Paperwork proved that the Glock was confiscated from

Appellant during a traffic stop by the highway patrol and subsequently then returned to Appellant.

{¶40} Jerry Hammonds testified that he knew Appellant, aka Whitey. He testified on January 20, 2017, he was in an office in one of his several barns retrieving medicine for sick cattle, when he noticed a handgun that was not his. Mr. Hammonds testified that he turned over the firearm to Detective Conkel.

{¶41} On cross examination, Jerry Hammonds admitted that he and Appellant had traded many items. He testified that Appellant had been making payments to buy a house from him (Mr. Hammonds) at the time of the murder. Mr. Hammonds denied that he wanted the house back because Appellant had not been making payments.

{¶42} Jerry Hammonds admitted that he owned a red van that he subsequently gave to John Bair. He denied owning the van at the time of the murder.

{¶43} Mr. Hammonds testified that he owed Appellant $11,500 because Appellant was not going to be renting the house. He testified that he offered Appellant's daughter a $20,000 refund on those payments. He admitted that he and Appellant's daughter did not reach an agreement so

Appellant filed suit against him. Mr. Hammonds denied that the dispute had anything to do with the gun.

### c. Investigative Witnesses

**{¶44}** Detective Malone testified that he had Kayla Rozell look at a photo lineup array of six males that included a picture of Appellant and asked her if any of them looked like the man she saw outside Amber Piquet's trailer that night. Detective Malone testified that he was chosen to present the photo lineup because he was not familiar with the suspect and it was not his case. The photos were each identified only by a number. Kayla Rozell stated that she was 100% sure that photo number two was the man she saw at Ms. Piquet's trailer. Photo number two was Appellant, Carl Hayden.

**{¶45}** Ohio BCI Investigator Shane Hanshaw testified that the evidence indicated that the bullets traveled from the exterior of the trailer to the interior. Investigator Hanshaw discovered two 40 caliber Winchester brand cartridges (the casing that is left once the bullet has fired) outside the trailer, and two projectiles were recovered from walls inside the trailer.

**{¶46}** Because Appellant became a suspect, Investigator Hanshaw also searched Appellant's home that night. A reddish maroon minivan was parked outside Appellant's home. In Appellant's bedroom, Investigator

Hanshaw discovered 40 caliber Wolf brand bullets, a Winchester 40 caliber ammunition box, 12 cartridges, and an empty Glock firearm box that had documentation indicating that the Glock from that box had been confiscated by the Highway Patrol and then released back to Appellant in 2014.

{¶47} On cross examination, Investigator Hanshaw testified that Appellant's reddish maroon van had a missing headlight.

{¶48} On redirect examination, Investigator Hanshaw testified that there was no evidence that the headlight had been knocked out by running into a deer, i.e. there was no blood or deer hair on the van.

{¶49} The State presented Detective Conkel's taped interview of Appellant the night of the murder. After reading Appellant his Miranda rights, Appellant stated that he had dated Amber Piquet for four years and they had one child, Sadie. Appellant stated that he was in court in the morning on January 9, 2017 with Ms. Piquet for a hearing regarding Sadie for custody and visitation. Appellant admitted that he been at Ms. Piquet's trailer before, including placing a camera on the premises, but denied being at her trailer that night. Appellant claimed that he had witnesses who would say that he was not out of the house the entire day. Appellant stated that he struck a deer with his van the previous night that knocked out a headlight.

He also testified that he no longer owned a handgun. Appellant testified that he had owned the minivan for about six weeks.

{¶50} Detective Conkel testified that in looking at the picture of Appellant's van, the headlight was knocked out, but there was no dent in the hood or any blood or organic matter on the van.

{¶51} Detective Conkel also testified that contrary to Appellant's assertion that he did not own a handgun, numerous persons advised her that Appellant did have a handgun.

{¶52} She testified that she took a DNA sample from Appellant. She testified that a Glock box was recovered from Appellant's home with paperwork showing that the Glock had been released back to Appellant after a traffic stop. She testified that the serial number of the Glock recovered from Jerry Hammonds' barn matched the one that the state patrol had returned to Appellant, and that she also took a DNA sample from Mr. Hammonds.

{¶53} Detective Conkel further testified that Ohio BCI analysis of the DNA found on the trigger of the gun recovered from Jerry Hammonds' barn matched Appellant's, did not match Mr. Hammonds', and the ballistics showed the bullets that were used to kill Ms. Piquet were shot from that gun.

{¶54} BCI Forensic Scientist Devonie Herdeman testified that the DNA samples were taken from Appellant and Jerry Hammonds, and compared to DNA found on the gun recovered in Mr. Hammonds' barn. The DNA from the gun matched Appellant's DNA, but not Mr. Hammonds'.

{¶55} On cross examination, she testified that DNA can remain on the surface of a gun for months or years.

{¶56} Heather Williams, an Ohio BCI forensic scientist, examined the Glock handgun recovered from Jerry Hammonds' barn. After test firing the Glock and comparing the spent cartridges with spent cartridges from the murder scene, it was her opinion that the spent cartridges found at the scene were fired from the 40 caliber Smith and Wesson Glock found in Mr. Hammonds' barn. She also opined that the two projectiles recovered from the murder scene are also "consistent" with the type of projectile fired by this Glock.

{¶57} Finally, Dr. Bryan Casto, the Forensic Pathologist and Deputy Coroner for the Montgomery County Coroner's Office, testified. He conducted Amber Piquet's autopsy and concluded that her death was caused by two gunshot wounds, with the one that passed through her chest and heart as the fatal event.

{¶58} The State rested its case.

Defendant's Case

{¶59} Appellant presented five witnesses including his attorney, a private investigator, his daughter, and his son.

{¶60} Attorney Robert Dever testified that he represented Appellant in a paternity suit filed October 17, 2016 pertaining to Sadie. Attorney Dever testified that he recalled that Appellant and Ms. Piquet came to a temporary agreement that while she was working during the day, Appellant would care for Sadie. Ms. Piquet would then pick up Sadie in the evening. However, weekends were referred to arbitration.

{¶61} On cross examination by the prosecutor, Attorney Dever acknowledged that part of that agreement required Appellant to stop bothering Ms. Piquet at work or at school.

{¶62} Teresa Blankenship testified that she was a private investigator hired by Appellant. She took pictures in the area of Amber Piquet's trailer in April 2016 around 7:00 p.m. She testified the houses were spread out and that it was difficult to see because it was so dark. She testified that the area was not well lit.

{¶63} Deborah Hayden-Townsend testified that she is Appellant's daughter. She testified that Appellant was purchasing a house from Jerry Hammonds. She testified that Appellant made a $55,000 down payment and

was to pay $500 a month thereafter. However, shortly after Appellant's arrest on January 12, 2017, she approached Mr. Hammonds about returning the down payment and Appellant would give the house back. Ms. Hayden-Townsend testified that Jerry Hammonds said that he could only refund $10,000. She testified that on January 20, 2017, Mr. Hammonds subsequently offered her $20,000, which she refused, which was three days before Jerry Hammonds found the Glock in his barn and turned it over to police.

{¶64} On cross examination by the prosecutor, she admitted that Appellant regularly carried a handgun. She also admitted that she paid Appellant's down payment for his house.

{¶65} David Hayden, one of Appellant's sons, also testified on behalf of the defense. He essentially corroborated Ms. Hayden-Townsend's story about seeking a refund from Jerry Hammonds for the house that Appellant was purchasing. He testified that things in the custody case for Sadie were going well.

{¶66} David Hayden testified that Jerry Hammonds and his father traded things like cattle, guns, et cetera all the time. He testified that he hadn't seen his father carry a gun since November.

{¶67} Finally, Mr. Hayden testified that people did not like his father because he drove around the area warning everyone that a sex offender lived in the area and was visiting Ms. Piquet.

{¶68} Appellant was ultimately convicted on all ten counts that were presented to the jury and after merging the murder and some assault convictions, the court sentenced him to life without parole plus twenty-two years. It is from the trial court's entry of sentence that Appellant now files a delayed appeal, setting forth three assignments of error for our review.

ASSIGNMENTS OF ERROR

I.    THE TRIAL COURT ERRED WHEN IT PERMITTED
      WITNESSES TO REPEATEDLY TESTIFY ABOUT HEARSAY
      STATEMENTS OF YOUR CHILDREN THAT WERE NOT
      ADMISSIBLE UNDER ANY HEARSAY EXCEPTION. THE
      TRIAL COURT ERRED WHEN IT PERMITTED TESTIMONY
      CONCERNING OUT-OF-COURT STATEMENTS OF YOUNG
      CHILDREN THAT DID NOT TESTIFY AT TRIAL IN
      VIOLATION OF THE APPELLANT'S RIGHT TO CONFRONT
      THOSE WITNESSES TESTIFYING AGAINST HIM.

II.   THE TRIER OF FACT, IN RESOLVING ALL CONFLICTS OF
      EVIDENCE LOST ITS WAY AND CREATED SUCH A
      MANIFEST MISCARRIAGE OF JUSTICE THAT THE
      CONVICTIONS MUST BE REVERSED AND A NEW TRIAL
      GRANTED, AS NO EVIDENCE WAS PRESENTED
      IMPLICATING MR. HAYDEN BESIDES UNRELIABLE,
      HEARSAY TESTIMONY OF YOUNG CHILDREN THAT DID
      NOT HAVE AN OPPORTUNITY TO SEE WHO SHOT THEIR
      MOTHER.

III.  THE EVIDENCE PRESENTED AT TRIAL WOULD NOT BE
      SUFFICIENT TO CONVINCE THE AVERAGE MIND OF MR.

HAYDEN'S GUILT BEYOND A REASONABLE DOUBT
BECAUSE THE ONLY TESTIMONY DIRECTLY IMPLICATING
MR. HAYDEN WAS THE HEARSAY TESTIMONY OF THE
DECEDENT'S YOUNG CHILDREN.

ASSIGNMENT OF ERROR I

{¶69}  In his first assignment of error, Appellant raises two distinct issues: (1) the trial court erred in admitting hearsay and (2) admission of that hearsay also violated the Confrontation Clause.  We will address the hearsay issue first.

{¶70}  Appellant asserts that the trial court erred in permitting adults to testify to out-of-court statements made by children that identified Ms. Piquet's killer in violation of the hearsay rule, Evid.R. 802.  At trial, Appellant objected to the admission of this hearsay on the basis that none of the children, who were inside the trailer, could have seen the assailant, who fired from outside the trailer, because: (1) the blinds were drawn on the window through which the fatal shots entered the trailer, which obstructed their view; (2) it was dark outside so the children's view looking out would have been inhibited by a reflection; and (3) the angle of the ground on which the assailant stood would have made have made it impossible for the children to see him.

{¶71} The State did not specifically respond to this argument, but instead argued that the statements by the children fit within the excited utterance exception to the hearsay rule.

{¶72} A "trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception." *State v. Dever*, 64 Ohio St.3d 401, 410, 1992-Ohio-41, 596 N.E.2d 436, *State v. Hiles,* 4th Dist. Ross No. 08CA3080, 2009-Ohio-6602, ¶ 6, citing *State v. Rohdes*, 23 Ohio St.3d 225, 229, 492 N.E.2d 430 (1986).

{¶73} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ohio Evid.R. 801. "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, (or) by statute." Ohio Evid.R. 802(C). However, there are exceptions to the exclusion, including when the declarant's statement is an "Excited Utterance," which is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Ohio Evid.R. 803(2). "This exception derives its guaranty of trustworthiness from the fact that declarant is under such state of emotional shock *that his reflective processes have been stilled.* Therefore, statements made under these circumstances are

not likely to be fabricated." *State v. Taylor*, 66 Ohio St.3d 295, 300, 612

N.E.2d 316 (1993), quoting McCormick, § 297 (2nd Ed. 1972).

{¶74} In *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955),

the court set out a four-prong test to determine if a statement might qualify

as an excited utterance:

> The trial judge reasonably finds (a) that there was some
> occurrence startling enough to produce a nervous excitement
> in the declarant, which was sufficient to still his reflective
> faculties and thereby make his statements and declarations
> the unreflective and sincere expression of his actual
> impressions and beliefs, and thus render his statement or
> declaration spontaneous and unreflective, (b) that the
> statement or declaration, even if not strictly
> contemporaneous with its exciting cause, was made before
> there had been time for such nervous excitement to lose a
> domination over his reflective faculties, so that such
> domination *continued* to remain sufficient to make his
> statements and declarations the unreflective and sincere
> expression of his actual impressions and beliefs, (c) that the
> statement or declaration related to such startling occurrence
> or the circumstances of such startling occurrence, and (d) that
> the declarant had an opportunity to *observe personally the*
> *matters asserted in his statement or declaration*.

{¶75} We begin our analysis by finding that the testimony referring

to the children's statements identifying Appellant as the assailant are hearsay

because they were made by out-of-court declarants for the purpose of

identifying the defendant is this case. The question is whether those

statements are excited utterances making them admissible as an exception to

the hearsay rule.

{¶76} Witnesses testified that the children were very upset, having witnessed the shooting of their aunt and mother just minutes before identifying Appellant as the assailant. This is certainly the type of emotional shock that stills reflexive processes making fabrication unlikely, especially in children. *See State v. Wright*, 12th Dist. Cuyahoga No. 71008, 1997 WL 607537, at *5 (A "child's exclamations within 20 minutes after witnessing the choking and murder of her mother while she was sitting next to her in the car, fit within classic examples of excited utterances. * * * To contend they were the product of reflective analysis is without merit.")

{¶77} Appellant makes no argument to the contrary. Instead, he argues that "nobody inside of the home would have been in a position to *see* the shooter outside of it." (Emphasis added.)

{¶78} In *Potter*, which set out the factors for determining when a statement is an excited utterance, the court does not state that the declarant must "see" the event, rather it stated that the declarant must "observe personally" the event. The word "observe" is not defined in *Potter* but its common meaning is broader than the word "see;" it means to "perceive; notice, see." *Freeman v. Beech Aircraft Corp.*, No. 80-11-0119, 1983 WL 4495, at *17 (Ohio Ct. App. Sept. 30, 1983). Courts have consistently held that "[a] witness must testify from first-hand knowledge which is acquired

by *perceiving* a fact through *one or more of the five senses*." (Emphasis added.) *State v. McDaniel*, No. 94CA08, 1995 WL 75394, at *4 (Ohio Ct. App. Feb. 21, 1995), *State v. Teets*, 2018-Ohio-5019, ¶ 28, *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 2002-Ohio-2220, ¶ 26, 95 Ohio St.3d 314, 320, 767 N.E.2d 707, 713. Similarly, we conclude that a declarant may ascertain first-hand knowledge though any one or more of his five senses.

{¶79} The door of the trailer was still locked when the Martins arrived so there is no evidence that indicates that the assailant ever entered the trailer. This conclusion is consistent with the evidence indicating that shots killing Amber Piquet were fired from outside the trailer. Pictures of the trailer show that the blinds appear to be drawn shut on all the windows, including the window through which the bullets passed. During one of the sidebars, defense counsel discussed the admissibility of the children's statements stating "these kids clearly didn't see anything. We agree. We can find no evidence that the children inside the trailer would have been able to see the assailant for all the reasons the defense alleges.

{¶80} Absent the children seeing the assailant, we can discern only two other possible sources of them identifying Appellant as the assailant. The first is that the assailant spoke during the attack and the children identified the voice as Appellant's, but that is mere speculation. Second, the

children heard Ms. Piquet refer to the assailant as "Carl" during the attack as

Gretchen communicated to Christy Martin after the murder, but that involves

multiple layers of hearsay, an issue never addressed by the parties or the trial

court.

{¶81} In the end, there is no reliable evidence to determine how the

children identified Appellant as the assailant. Under these particular facts,

we hold that the trial court abused its discretion in admitting the children's

statements that identified Appellant the assailant. This renders Appellant's

Confrontation Clause issue moot, but it does not end our analysis.

{¶82} Although it was an abuse of discretion for the trial court to

admit testimony regarding the children's statements, the error was

nevertheless harmless because there was overwhelming evidence of

Appellant's guilt beyond a reasonable doubt.

{¶83} "Crim.R. 52(A) states that reviewing courts must disregard

'[a]ny error, defect, irregularity, or variance which does not affect

substantial rights.' The phrase " ' 'substantial rights' has been interpreted to

require that ' " 'the error must have been prejudicial.' " ' " *State v. Butcher*,

4th Dist. Athens No. 15CA33, 2017-Ohio-1544, ¶ 48, quoting *State v.*

*Morris*, 141Ohio St.3d 399, 2014–Ohio-5052, 24 N.,E.3d 1153, ¶ 53. "In

general, " 'improper evidentiary admission * * * may be deemed harmless

error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming.' " *Id.,* at ¶ 49, quoting *Morris* at ¶ 32, *see also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 304, 70 N.E.3d 508, ¶ 234, (improper admission of prejudicial evidence was harmless in light of the overwhelming evidence of Appellant's guilt), *State v. Tench*, 2018-Ohio-5205, --- N.E.3d ---, 2018 WL 6921048 , ¶ 175 (same).

**{¶84}** *Morris* set out a three-prong approach to determine whether an error was harmless: (1) did the error impact the verdict, (2) was the error harmless beyond a reasonable doubt, and (3) once the prejudicial evidence is excised, does the remaining evidence establish the defendant's guilt beyond a reasonable doubt. *Morris*, 141Ohio St.3d 399, 2014–Ohio-5052, 24 N.E.3d 115, ¶ 27-29.

**{¶85}** There is nothing in the record that suggests that the children's statements identifying Appellant as the assailant affected the verdict. *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5053, 24 N.E.3d 1153, 1160, ¶ 27, quoting *Sate v. Crawford,* 32 Ohio St.2d at 255, 291 N.E.2d 450 ("[A] judgment of conviction should not be reversed because of 'the admission * * * of any evidence offered against * * * the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby.' "). And, after excluding from consideration the children's statements that

identified Appellant as the assailant, there is overwhelming evidence that Appellant, with prior calculation and design, shot and killed Amber Piquet beyond a reasonable doubt.

{¶86} Kayla Rozell, Amber Piquet's neighbor, testified that she saw Appellant attempting to break down the door of Ms. Piquet's trailer and then escape the scene in a reddish van right after shots were fired. Ms. Rozell testified that she did not know Appellant's name at that time, but she did recognize Appellant from seeing him in the neighborhood frequently. This testimony is consistent with her 911 call when she said to the operator "I had seen that guy." The night of the murder Ms. Rozell also picked Appellant's photo out of a blind photo lineup as being the assailant with 100% confidence, and she identified Appellant as the attacker in open court.

{¶87} Moreover, there was additional evidence supporting that Appellant shot and killed the victim with prior calculation and design.

{¶88} After Ms. Piquet and Appellant split up and Ms. Piquet moved out, Appellant told one of his neighbors, Gene Smith, that he had thought about killing Ms. Piquet, Ms. Piquet's mother and brother, Ms. Piquet's whole family. Mr. Smith also mentioned that Appellant had stated that he needed to acquire a vehicle that was quieter than his truck so he could sneak up on her. Six weeks before the murder, Appellant purchased the

red/maroon van. A neighbor testified that Appellant was obsessed with Amber Piquet, an obsession that intensified prior to her death.

{¶89} Several of Appellant's neighbors testified that they saw a silver truck drive into Appellant's driveway on the night of the murder, and then a red/maroon van leave his premises shortly thereafter within a time frame that could place Appellant at Amber Piquet trailer within the timeframe of the murder.

{¶90} The night of the murder Appellant visited a neighbor and asked him to be a witness that Appellant had been home all day, even though that neighbor said that Appellant was not home all day.

{¶91} In his home, Appellant had an empty box for a Glock handgun, the paperwork for that gun, and ammunition. The Glock recovered from Jerry Hammonds' barn matched the gun box and paperwork found in Appellant's house. The Glock also had DNA on the trigger that matched Appellant's DNA. There was expert testimony that the empty cartridges found at the murder scene were fired by that Glock, and projectiles found at the murder scene were "consistent" as having been fired by that Glock.

{¶92} The evidence that Appellant shot and killed Amber Piquet with prior calculation and design is overwhelming.

{¶93} There testimony from Appellant's daughter and son seemed to suggest that Appellant's neighbor, Jerry Hammonds, who owned a red van, was motivated to seek revenge against Appellant because Appellant filed suit against Mr. Hammonds to recover payments that Appellant had made to Mr. Hammonds to buy the house. They seemed to suggest that Jerry Hammonds turned over the Glock to police shortly after that lawsuit was filed knowing that Appellant was a suspect in killing Ms. Piquet. The entire theory is predicated upon Appellant having traded the Glock to Jerry Hammonds prior to the murder, but there is no evidence, let alone persuasive evidence, that such a trade occurred.

{¶94} Accordingly, we hold that even though the trial court abused its discretion in permitting the children's statements identifying Appellant as the assailant, the error was harmless because there was overwhelming evidence supporting Appellant's convictions beyond a reasonable doubt.

ASSIGNMENTS OF ERROR II and III

{¶95} In his second assignment of error, Appellant assets that there is insufficient evidence to support his convictions. In his third assignment of error, Appellant asserts that his convictions are against the manifest weight of the evidence. Both arguments rely primarily upon the assertion that absent the children's statements, there was no witness who saw Appellant "shoot

into the home." Consequently, Appellant argues, "the jury placed far too much weight on the out-of-court statements of the children."

{¶96} Having addressed and resolved those issues in the first assignment of error, and having found that even absent the children's statements there is overwhelming evidence of Appellant's guilt, Appellant's second and third assignments of error are moot.

{¶97} Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED**.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Hess, J.: Concur in Judgment and Opinion.

For the Court,


BY: _____
Matthew W. McFarland, Judge

### NOTICE TO COUNSEL
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**